# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

Benjamin Bryan and Simon Ortega,

        Plaintiffs,

    v.

Patrick M. Mariakis, in his individual
capacity,

        Defendant.

Case No. 3:25-cv-43-jdp

---

### Plaintiffs' Brief in Opposition to Summary Judgment

---

## STATEMENT OF FACTS

In addition to the disputed facts set forth in Plaintiffs' Response to Defendant

Patrick Mariakis' Proposed Findings of Facts, the facts necessary to support Plaintiff's

opposition are contained in Plaintiff's Additional Proposed Findings of Fact ("PFOF").

## ARGUMENT

### I.      Summary judgment standard

Summary judgment is only appropriate if the movant shows there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  A "genuine" dispute of material fact is created when "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At this stage in the proceedings, the

Court must construe all facts and reasonable inferences in the light most favorable to Plaintiff, the non-moving party. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

On summary judgment, the court does "not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) (citation omitted). The Seventh Circuit instructs, "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Any internal inconsistencies in a witness's testimony "create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 2010) (internal quotation omitted). Lastly, Plaintiff "need not match [Defendants] witness for witness, nor persuade the Court that [her] case is convincing, [she] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). The law and evidence preclude the Defendant's motion for summary judgment.

Testimony contained in declarations that contradict prior deposition or other sworn testimony should be ignored under the "sham affidavit rule." *Gills v. Hamilton*, --- F.4th ---, 2026 WL 113265, at *2 (7th Cir. Jan. 15, 2026) (citing *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 956 (7th Cir. 2024)). Similarly, affidavits are also appropriately excluded when the affidavits "aren't directly contradictory but 'add new factual details not previously disclosed in deposition testimony when those details seek to undo the effects

of prior testimony and manufacture a dispute to get past summary judgment.'" *Id.*

In addressing this motion for summary judgment, the Court will weigh video evidence. When there is video evidence "blatantly contradict[s]" a nonmoving party's version of events, the Court should not adopt the non-moving party's version of events. *Smith v. Finkly*, 10 F.4th 725, 730 (7th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Where the video evidence is ambiguous, the Court should not rely upon it to resolve genuine issues of material fact, except as to those facts from the video that can be resolved "beyond debate." *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019).

## II. Bryan's plea of no contest and the *Heck v. Humphry* Doctrine do not bar Bryan's suit.

Defendants' reliance on *Heck v. Humphrey* is misplaced. Heck bars only those § 1983 claims whose success would necessarily imply the invalidity of an existing conviction**,** and it does not preclude claims that can coexist with a conviction arising from the same encounter. 512 U.S. 477, 487 (1994). In *Heck v. Humphry*, 512 U.W. 477 (U.S. 1994), the Court concluded that a § 1983 suit that would "necessarily imply" the invalidity of the fact of a conviction is not cognizable unless and until the individual obtains a favorable termination of the state or federal challenge to his conviction. *Nelson v. Campbell*, 541 U.S. 637, 646 (2004). Bryan's suit does not necessarily require the Court to invalidate, negate, or collaterally attack his misdemeanor convictions under Wis. Stat. § 946.41(1), nor does it inherently require that the Court find that Officer Mariakis lacked all lawful authority to act. Rather, Bryan's claim requires only a finding that

the manner and degree of force used by Mariakis exceeded constitutional limits, even assuming arguendo that Mariakis possessed lawful authority and that Bryan was convicted of resisting and obstructing.

This theory falls squarely within controlling Seventh Circuit precedent. In *VanGilder v. Baker*, the court held that an excessive-force claim is not barred by *Heck* where success would not negate a resisting-officer conviction but would instead establish that the officer used force beyond what was constitutionally permissible. 435 F.3d 689, 692 (7th Cir. 2006). As the court explained, applying *Heck* in such circumstances would imply that "once a person resists law enforcement, he has invited the police to inflict any reaction or retribution they choose," a result that would gut § 1983 protections. *Id.* Likewise, *Evans v. Poskon* confirms that *Heck* bars only those excessive-force theories that depend on proving the plaintiff did not resist at all; claims alleging unreasonable force during or after an encounter involving resistance remain cognizable**.** 603 F.3d 362, 364 (7th Cir. 2010) (finding claim of excessive force to effect custody and police beating after in custody were not barred by *Heck,* but plaintiff's contention he did not resist being taken into custody was barred); *see also Wendricks v. Serres*, 2022 WL 3700887, at *9-10 (W.D. Wis. Aug. 26, 2022) (citing *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 764 (7th Cir. 2008) ("The fact that Hardrick 'struggled while being handcuffed' at one point in time does not preclude the possibility that at another point in time, Hardrick was 'peaceably waiting to be handcuffed.' Whether a fact-finder would find this scenario plausible is not for us to conclude, but in terms of *Heck*, it is not one that necessarily

implies the validity of the conviction, and does not bar Hardrick's excessive force claim.").

Because a judgment for Bryan on his excessive-force claims would not necessarily imply that his convictions are invalid, *Heck* poses no bar to this suit.

Additionally, to the extent Defendants argue that Bryan's "no contest" plea to misdemeanor criminal charges of Wisconsin Statute 946.41(1) bar this suit. This argument fails. "Whether a plaintiff's § 1983 claim is barred by a state court conviction is determined by the state's rules of collateral estoppel." *Brown v. City of Chicago*, 599 F.3d 772, 774 (7th Cir. 2010) (citing 28 U.S.C. § 1738; *Sornberger v. City of Knoxville,* 434 F.3d 1006, 1020 n. 9 (7th Cir.2006)). "The essential characteristic of a plea of *nolo contendere* is that it cannot be used collaterally as an admission." *Robinson v. City of W. Allis*, 619 N.W.2d 692, 702 (Wis. 2000) (quoting *Lee v. State Bd. of Dental Exam'rs,* 139 N.W.2d 61, 63 (Wis. 1966)). "The essential characteristic of the no contest plea, which is that it cannot be used collaterally as an admission in future civil litigation, dictates that the defendants may not use the plea to prevent litigation in this subsequent civil action." *Robinson v. City of W. Allis*, 619 N.W.2d 692, 702 (Wis. 2000).

Ultimately, Mariakis' use of force on Bryan should be weighed on the merits. Additionally, Mariakis fails to show how Bryan's plea has **any** impact on Ortega's claims, as no reasonable suspicion ever existed to seize Ortega, and it is uncontested that he was not charged with any offense, and he did not plead guilty to any offense.

### III. Mariakis use of the K-9 on Bryan was excessive force and violated clearly established law.

Bryan alleges that Mariakis violated his fourth amendment right to be free from excessive force pursuant to 42 U.S.C. § 1983. The elements of a Section 1983 claim require a showing that "a person acting under color of state law … deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Armato v. Grounds*, 766 F.3d 713, 720 (7th Cir. 2014) (citation omitted). There is no dispute that Mariakis was acting under color of state law. The critical question is thus whether Mariakis violated Bryan's Fourth Amendment right to be free from excessive force.

#### A. The Fourth Amendment's excessive force standard

The Fourth Amendment to the United States Constitution protects, in part, against "unreasonable searches and seizures." U.S. Const. amend. IV. Claims for excessive force "originate[] from the Fourth Amendment's protection against unreasonable seizures." *Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). Accordingly, claims for excessive force are analyzed under the Fourth Amendment's "reasonableness" standard. *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (quoting *Lawrence v. Kenosha Cty.*, 391 F.3d 837 (7th Cir. 2004); *see also Graham*, 490 U.S. 386, 396-97). The Graham standard is an objective inquiry. *Graham*, 490 U.S. at 397. Therefore, "an officer's subjective beliefs and motivations are irrelevant." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) (citing *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003)).

An officer's use of force is unconstitutional when "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Becker*, 821 F.3d at 925 (quoting *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2004)). This inquiry is fact specific. *Id.* In examining an officer's use of force, courts look at "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Here, The Court should consider the reasonableness of each use of force discretely. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) ("In some cases each discrete use of force must be separately justified.") (citing *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) ("We carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage.").

"It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (citations omitted). "As the Seventh Circuit has explained, 'as the threat changes, so too should the degree of force.'" *Davis v. Allen*, 21-cv-565-wmc, 2023 WL 2914807, at *4 (W.D. Wis. Apr. 12, 2203) (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010)).

K-9 "bite and hold" cases are analyzed pursuant to the Fourth Amendment's objective reasonableness standards for excessive force. *Davis*, 21-cv-565-wmc, 2023 WL 2914807, at *3 (citing *Graham*, 490 U.S. at 394). While K-9 bite and hold techniques are not per se deadly force, they are clearly force at the "**higher end of the spectrum**" and

7

thus a significant intrusion on an individual's rights. *Becker*, 821 F.3d at 926 (emphasis added); *see also Davis*, 2023 WL 2914807, at *3 ("Certainly, Deputy Allen's order for Koda to 'bite and hold' was a significant use of force, 'at the higher end of the spectrum,' meaning that the government's intrusion on Davis's rights was significant.") (citing *Becker*, 821 F.3d at 926).

### B. K-9 excessive force case law

*Becker* v. *Elfreich* is highly instructive and sets the contours of Bryan's clearly established rights in this case. 821 F.3d 920. In *Becker*, the officers had an arrest warrant alleging that "Becker had held a knife to his brother-in-law's neck and threated to kill him." *Id.* at 923. The plaintiff was upstairs sleeping when officers arrived but responded to his mother's call that officers were there to arrest him that he would come downstairs, which he did within two minutes. *Id.* at 924. As the plaintiff descended the stairs, the defendant released his K-9, which ran into the house and bit the plaintiff in the ankle near the bottom step. *Id.* The plaintiff yelled that he was giving up, kept his hands on his head and asked the defendant to release his dog. *Id.* The defendant entered the house and saw the plaintiff had his hands on his head but did not release the dog. *Id.* The defendant directed the plaintiff to the ground and then pushed him to the ground, which caused the dog to lose his grip but then bite down harder. *Id.* The plaintiff laid on the ground with his hands behind his back but the dog continued to bite him, and the defendant claimed he could not release the dog until the plaintiff was handcuffed—which took a few minutes. *Id.* The K-9 caused serious injuries to the plaintiff's calf. *Id.*

The *Becker* Court found the defendants actions were unreasonable, constituting excessive force. *Id.* at 928. The court reasoned that when the defendant first saw the plaintiff, he should have recognized the plaintiff was surrendering as his hands were up and he was being bitten by the dog. *Id.* at 927. Moreover, the plaintiff "did not exhibit any sort of aggressive behavior toward [the defendant] or anyone else[,]" and he was not resisting arrest or attempting to evade arrest by flight. *Id.* The Defendant's argument that the plaintiff did not listen to his command to get to the ground was not persuasive. Critically, the Seventh Circuit rejected the argument that Becker's failure to immediately comply justified continued K-9 force. Rather, the Seventh Circuit noted this low-level resistance did not warrant the force used, stating:

> But even if Becker had heard the command, at most Becker's failure to get to the ground—if that were possible with Axel biting his ankle—would "have been passive noncompliance of a different nature than the struggling that we have found warrants escalation of force." "[W]illful non-compliance [is] not the same as 'actively resisting' but instead a passive 'resistance requiring the minimal use of force.'"

*Id.* (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 512, 525 (7th Cir. 2012)).

Nor was the *Becker* Court persuaded by the defendant's argument that the plaintiff could have been armed and was still a danger until he was handcuffed. To the contrary, the court noted that "in every arrest there is a possibility that the individual is armed and that does not justify allowing [the dog] to continue to bite [the plaintiff] while [the defendant officer] pulled the plaintiff down the three steps and handcuffed him. *Id.* (citing *Ellis v. Wynalda,* 999 F.2d 243, 247 (7th Cir.1993)). This was so even though the plaintiff was being arrested for "a serious offense[.]" *Id.* at 928.

This Court's opinion in *Davis v. Allen* is also instructive. 2023 WL 2914807. In *Davis v. Allen*, the court denied summary judgment and qualified immunity where a deputy deployed a K-9 in a "bite and hold" seizure and allowed the dog to continue biting the plaintiff for approximately two minutes, causing severe and permanent injuries, despite disputed evidence that the plaintiff was subdued or at most passively resisting. *Id.* at *1–2.

The plaintiff, Davis, had multiple outstanding felony warrants, including for violent offenses, fled from police, and hid inside a small, cluttered trailer. *Id.* at *1–2. The court held that the officer's initial decision to deploy the K-9 to locate Davis inside the trailer could be reasonable under the circumstances because there were concerns that Davis could be armed and dangerous. *Id.* at *3. However, the court emphasized that the constitutional inquiry does not end there: as the threat changes, so too must the level of force. *Id.* at *4 (citing *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010)). Critically, the court found that a reasonable jury could conclude that once Davis was lying prone, screaming in pain, with his hands visible and raised, and no longer posing an immediate threat, the continued K-9 bite constituted objectively unreasonable force, even though Davis had earlier fled and was wanted on serious charges. *Id.* at *4–5. The court rejected the argument that the mere possibility Davis could be armed justified allowing the dog to continue biting, reiterating that the generalized risk present in every arrest does not permit prolonged canine force against a subdued suspect. *Id.* at *4 (citing *Becker*, 821 F.3d at 927-28 (additional citation omitted)).

On qualified immunity, the court held that it was clearly established at the time of the incident that officers may not use significant force, including prolonged K-9 bites, against a suspect who is subdued, attempting to surrender, or only passively resisting, notwithstanding the suspect's prior resistance, flight, or violent criminal history. *Id.* at \*5 (citing *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014)). Because material factual disputes existed regarding when Davis became subdued and whether continued K-9 force was justified, the court denied qualified immunity. *Id.* at \*5–6.

The case of *Johnson v. Scott* is inapplicable. 576 F.3d 658 (7th Cir. 2009). *Johnson* involved a suspect wanted in connection with a shooting, who fled from police in a vehicle and then on foot, ignored emergency lights, led officers on a dangerous pursuit, and made a last-second surrender literally one second before the officer and police dog reached him. *Id.* at 659–61. Under those circumstances, the Seventh Circuit held that the officer was not required to take the suspect's apparent surrender "at face value" and could reasonably deploy a police dog given the rapidly evolving, high-risk situation, the severity of the crimes at issue, and the officer's reasonable belief that the suspect might be armed. *Id.* at 660–61. Critically, however, the court reaffirmed that "a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders," *id.* at 660, and emphasized that its holding was limited to the split-second context of an active flight and uncertain surrender. As discussed in more detail below, unlike *Johnson*, this case involves no flight, no violent felony, no hot pursuit, and no last-second surrender, but rather an encounter arising from a civil license issue in which Bryan was, generally engaging in passive or low-level

resistance at the times where he otherwise was not in full compliance. Accordingly, *Johnson* does not support the use of K-9 force here and instead underscores that canine force is justified only in circumstances involving active evasion or immediate threat—conditions absent from this case.

### C. Mariakis violated Bryan's Fourth Amendment right to be free from excessive force.

When the evidence is viewed in the light most favorable to Bryan, Mariakis violated the Fourth Amendment by using force that was grossly disproportionate to the circumstances at multiple discrete stages of the encounter. Mariakis violated Bryan's right to be free from excessive force during several instances during their encounter. *Dockery*, 911 F.3d 467 (appropriate to address the various uses of force separately).

### 1. The initial deployment of Ikar constituted excessive force

The encounter began as a civil license inquiry, not a criminal investigation. Bryan was suspected, at most, of driving a vehicle associated with an expired license—a non-criminal, non-arrestable offense. (PFOF ¶¶ 8-9.) Prior to Mariakis going hands on, Bryan did not flee, threaten anyone, or engage in conduct posing an immediate danger. (PFOF ¶¶ 32, 34-35.) When Mariakis approached Bryan inside and outside the store, he did not confirm Bryan's identity, request identification, explain the basis for the stop, or issue commands justifying physical force. (PFOF ¶¶ 27-29, 37-38.) Instead, Mariakis abruptly went hands-on and applied control techniques in response to minimal noncompliance during a civil investigation. (PFOF ¶¶ 26-45.) Even if Mariakis could lawfully detain or arrest Bryan for obstruction at that point, the Fourth Amendment

required that any force used be proportionate to the governmental interest at stake. *Graham*, 490 U.S. 396.

On this record, the severity of the suspected offense was minimal, Bryan posed no immediate threat, and he was not attempting to flee. Mariakis asks this Court to focus solely on acts of described resistance by Bryan at the time of the deployment. However, the Supreme Court reminded lower courts recently in *Barnes v. Felix* of the well-established need to weigh the "totality of the circumstances" – an "inquiry into a use of force [that] has no time limit." 605 U.S. 73, 80 (2025). In *Barnes,* a unanimous Supreme Court reversed the Fifth Circuit for adhering to a too myopic view of the events. *Id.* at 83.

The *Barnes* Court was careful to remind lower courts that "the 'severity of the crime' prompting the stop can carry weight in the analysis." (citing *Graham*, 490 U.S. at 396. In a light most favorable to Bryan when weighing all of the circumstances, any resistance offered by Bryan under these circumstances did not justify the release of the K-9. The stop was for a civil offense where Mariakis still had not identified Bryan or attempted to identify Bryan. (PFOF ¶¶ 102-104.) Bryan was attempting to purchase and smoke cigarettes, he was not threatening anyone. (DPFOF ¶ 48; PFOF ¶ 51.) Bryan did offer some resistance to Mariakis after he was placed in a wrist lock, and ultimately broke free of Mariakis's grip. (PFOF ¶ 52.) But Bryan never attempted to puch, kick, or strike Mariakis. (PFOF ¶ 55.) Given these circumstances, Mariakis did not provide Bryan with ample warnings and opportunity to comply before escalating the force to a K-9

deployment. *Barnes*, 605 U.S. at 80 (whether the officer gives warnings or his other efforts to control the situation are relevant considerations) (citation omitted).

Under the totality of these circumstances, Bryan's conduct did not warrant an intrusion so severe as to justify the release of a K-9 for purposes of biting Bryan—a "significant intrusion" on Bryan's rights. *See Becker*, 821 F.3d at 926.

### 2. Ikar's continued biting of Bryan while he was on the ground constituted excessive force.

Even assuming arguendo that the initial decision to deploy the K-9 was appropriate, the constitutional violation here does not solely turn on the question of initial deployment. Once Bryan had complied with commands to get on the ground, the justification for Ikar's continued biting of Bryan ended. Here, the evidence permits a reasonable jury to find that almost immediately after the dog bit Bryan, Bryan went to the ground and complied with commands, placing himself in a prone position. (PFOF ¶¶ 57-60.) From that point forward, Bryan did not pose a threat, was not fleeing, and was—at most—engaging in passive resistance or struggling to comply while being actively bitten, which was made worse by Mariakis directing Bryan to get on the ground when he was already there and to move in directions that were contrary to the direction Ikar was biting and pulling Bryan. (PFOF ¶¶ 58-89.)

Nevertheless, Mariakis continued to allow Ikar to bite Bryan both permissibly and through his inability to control Ikar, i.e, Ikar not complying with verbal commands. (PFOF ¶¶ 58-99.) Bryan was subjected to continued biting for two minutes and nineteen seconds due to these failures (PFOF ¶ 99), which is squarely governed by the well-

established principles set forth in *Becker*, 821 F.3d at 928. When weighing the totality of the circumstances addressed above (i.e., civil matter, no threat), a genuine issue of material facts exists as to whether Mariakis violated Bryan's constitutional rights.

Additionally, Mariakis' mistake argument is without merit. Bryan plainly testified that he was being bitten during that time, which Mariakis recognizes he must accept. (Def. Br. at 10.) Mariakis had already instructed Ikar to get "out" at 5:16 on the Mariakis Body Camera (almost 50 seconds before removing Ikar from the bite), meaning there was no basis for Ikar to be on Bryan whatsoever. (See PFOF ¶¶ 90-93, 99.) Mariakis cites no case law to suggest that it is reasonable to leave a K-9 with its sharp teeth capable of causing severe damage attached to a subject's clothing when the subject is compliant and any potential threat has passed. The risk of harm to the subject is obvious and unreasonable.

### 3. Mariakis' release of Ikar to bite Bryan after Bryan sought safety in the store was unreasonable.

After Bryan laid on the ground waiting to be handcuffed for over a minute and a half and Mariakis charged Ortega with Ikar, Bryan attempted to keep himself safe from Ikar by getting up from the ground and entering the store. (PFOF ¶¶ 100, 107, 145.) Any reasonable officer would have understood under the totality of these circumstances that Bryan was not attempting to evade arrest by flight, but rather was trying to escape further attacks by Ikar, who Mariakis had already displayed an inability to control. Mariakis released Ikar who entered the store and Bryan immediately attempted to exit the store. (PFOF ¶¶ 109-110.) Rather than allow Bryan to exit the store, Mariakis physically sealed

Bryan in the store so Ikar could bite him and gratuitously yelled, "Get him, buddy!" (PFOF ¶¶ 110-115.) Under *Graham* and summary judgment standards, any perceived flight was minimal and not for purposes of evading arrest, any resistance by entering the store was minimal, Bryan was not posing an immediate danger to anyone, and he was not suspected of committing any serious crime. There was ample opportunity for Mariakis to give Bryan a warning before the release of Ikar where Ikar could have injured anyone he came across. Once again, genuine issues of material fact exist as to whether this K-9 deployment was reasonable under the standards set forth by *Graham*, *Barnes*, and *Becker*.

Additionally, even assuming arguendo that the deployment into the store—and sealing Bryan into the store to be bitten—was reasonable, Mariakis once again allowed Ikar to continue biting Bryan after Bryan complied and was on the ground. (PSOF ¶¶ 116-122.) And once again Mariakis failed to control Ikar as Ikar continued to bite Bryan even as Mariakis attempted to pull Ikar from Bryan's arm. (PFOF ¶¶ 122-126.) Ikar's actions of shaking his head while biting were consisting with bite and tear, rather than bite and hold technique. (PFOF 118.) Bryan suffered serious permanent injuries as a result of Mariakis' and Ikar's conduct towards him, including neuropathy of the right forearm, ulnar neuropathy of right upper extremity, lateral ulnar collateral ligament injury, lacerations and puncture wounds with attendant scarring, and PTSD. (PFOF ¶ 155.) This again violates the standards set forth by *Graham*, *Barnes*, and *Becker.*

**D. Bryan's right to be free from these uses of excessive force was clearly established.**

**1. Overview of qualified immunity standard.**

Qualified immunity is an affirmative defense that "strikes a balance between 'protecting a government official's ability to function without the threat of distraction and liability' and 'affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices.'" *Weinmann v. McClone*, 787 F.3d at 447–48 (7th Cir. 2015) (cleaned up) (quoting *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)). The defense thus "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 447–48 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In conducting the clearly established inquiry, the Court first "consider[s] controlling Supreme Court and Seventh Circuit precedent. *Werner v. Wall*, 836 F.3d 751, 762 (7th Cir. 2016) (citing *Abbott v. Sangamon Cty.*, 705 F.3d 706, 731 (7th Cir. 2013)). If controlling precedent does not show the law is clearly established, the Court "cast[s] a wider net and examine[s] 'all relevant case law.'" *Abbott*, 705 F.3d at 731. The pertinent "question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional."[1] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotation marks omitted).

---

[1] This Circuit's caselaw assigns the plaintiff the burden to disprove that the defendants are entitled to qualified immunity. *See, e.g., Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) ("Though it is an affirmative defense for pleading purposes, the plaintiff carries the

For the law to be clearly established, "the right in question must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Weinmann*, 787 F.3d at 450 (quoting *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006)).

In *Tolan v. Cotton*, the Supreme Court was critical of the Fifth Circuit's "fail[ure] to credit evidence that contradicted some of its key factual conclusions," and found that "the [lower] court improperly weigh[ed] the evidence and resolved disputed issues in favor of the moving party…" 572 U.S. 650, 657 (2014) (internal quotes and quotation omitted). The Court concluded by stating that the lower court had exhibited a "clear misapprehension of the qualified immunity standard" and the Court was forced to reach the "inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Id.* at 659.

**2. Bryan's claims are not barred by qualified immunity.**

---

burden of showing that defendants are not immune."). Plaintiffs satisfy that burden in this case, but they preserve the right to challenge this Circuit's burden framework, which is "not justified by . . . any federal statute, the rules of civil procedure, or the common law." *Medina v. Cram*, 252 F.3d 1124, 1135 (10th Cir. 2001) (Seymour, J., dissenting), and conflicts with the law of other circuits. *See, e.g., Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014); *Bailey v. Pataki*, 708 F.3d 391, 404 (2d Cir.2013) ("Qualified immunity is an affirmative defense and the burden is on the defendant-official to establish it on a motion for summary judgment.").

Since 2016, for all the reasons described above about the decision in *Becker,* the 7th Circuit put Mariakis and all officers on notice that they cannot let a K-9 continue to bite suspects who pose no or minimal resistance. *Becker*, 821 F.3d at 928. But this was actually the case even earlier, as the Becker court noted,

> prior to 2011 it was well-established that "police officers cannot continue to use force once a suspect is subdued." And "it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects." Further, it was clearly established that only minimal force is warranted where the accused is passively resisting. Additionally, we have previously held that it was clearly established "that officers could not repeatedly use an impact weapon to beat into submission a person who was not resisting or was merely passively resisting officers' orders."

*Id.* at 928-29 (internal quotations and citations omitted). Here, the Court needs to do little more than apply *Becker* in the same manner it applied *Becker's* principles to *Davis v. Allen*, 2023 WL 2914807.

The Seventh Circuit's decision in *Alicea v. Thomas* further confirms that the constitutional limits governing this case were clearly established well before the events at issue here. 815 F.3d 283 (7th Cir. 2016). In *Alicea*, the court held that commanding a police dog to attack a suspect who is complying with orders or offering, at most, passive resistance constitutes excessive force, and that the prohibition against significant force applies notwithstanding a suspect's prior flight, resistance, or the mere possibility that the suspect could be armed. *Id.* at 294–96. The court emphasized that it was already clearly established that officers may not use significant force against non-resisting or passively

19

resisting individuals and that surrender should not be rendered futile as a means of de-escalation. *Id.* Taken together with *Becker* and *Davis*, *Alicea* leaves no doubt that by the time of Bryan's encounter with Mariakis, the law clearly prohibited prolonged or repeated K-9 force against a suspect who was subdued, compliant, or only passively resisting.

As addressed above, Mariakis fails to cite any K-9 case law reflecting that Mariakis' use of Ikar on Bryan was reasonable.

### IV. Mariakis violated Ortega's First Amendment Rights and unlawfully seized Ortega.

#### A. Ortega suffered retaliation in violation of the First Amendment.

To prevail on a claim of First Amendment retaliation, a plaintiff must establish the following elements:

> (1) it engaged in activity protected by the First Amendment,
>
> (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was a "at least a motivating factor" in the Defendants' decision to take the retaliatory action.

*Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (citation omitted).

## 1. Ortega's speech and actions were protected activity.

> "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. 'Speech is often provocative and challenging.... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'

*City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) (*quoting Terminello v. Chicago*, 337 U.S.1, 4 (1949) (finding statute that prohibited speech that interrupts a police officer was unconstitutional). In fact, the first amendment "protects even profanity-laden speech directed at police officers." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (citing *City of Houston*, 482 U.S. 451, 461)).

Defendant relies on *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571-72 (1942) for the proposition that obscene, profane, and insulting or fighting words are not protected. (Def. Br. at 15-16). But Defendant fails to identify that *Chaplinsky* was narrowed considerably in *Cohen v. California*, 403 U.S.15 (1971) where fighting words were limited to "personally abusive epithets which, when addressed to the ordinary citizen, are inherently likely to provoke reaction." Moreover, statements like Ortega's comment of "weird-ass fuckin Nazi" and "motherfucker" have been protected in other cases. *See Thurairajah v. City of Fort Smith, Arkansas*, 925 F.3d 979, 982, 985 (2019) (finding yelled statement "f**k you" to police officer was protected free speech and affirming denial of qualified immunity to arresting officer) (citing *Cohen*, 403 U.S. at 25).

Defendant recognizes his position "runs up against Seventh Circuit case law [*Payne*]," but he fails to give sufficient weight to *Payne* and *City of Houston*, instead trying to ratchet up the circumstances here into making Ortega's statements something more than they are—and less worthy of protection. At bottom, this was not a crowded area with numerous others to incite; there was Bryan, and an unsympathetic service station employee nearby. (PFOF ¶ 143.) Throughout the encounter, Ortega never did anything but comply with Markakis's demands, and he never encouraged any act of violence or noncompliance by Bryan. (PFOF ¶¶ 138, 141, 147-148.). Accordingly, the context of Ortega's comments supports his position, not Mariakis'.

## 2. Ortega suffered a deprivation that would deter future First Amendment conduct.

The second element is an objective test and courts ask, "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *FKFJ v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021). There need not be an independent constitutional violation to be a deprivation; rather, "the law merely requires some negative consequence (deprivation) with a chilling effect on First Amendment activity." *Id.* (quoting *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020). The mere "realistic threat of arrest is sufficient to chill First Amendment rights." *Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) (citations omitted); *see also Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012); *Pindak v. Dart*, 125 F. Supp. 3d 720, 751 (N.D. Ill. 2015) ("Being threatened with handcuffs and escorted off the Plaza by two security guards easily surpasses the threshold of an action

likely to deter a person of 'ordinary firmness' from attempting to panhandle in the future."). Here, the threatened use of a K-9 that had already bitten Bryan while not responding to verbal commands, and the application of handcuffs with not only the implication or threat of arrest but amounting to a de facto arrest as discussed below, easily meets this element as sufficient to chill Ortega's lawful criticisms of Mariakis' conduct.

### 3. A genuine issue of material facts exists as to whether Ortega can show a causal link between his speech and the retaliation.

The third element for first amendment retaliation is causation, which may be proven through direct or circumstantial evidence. *FKFJ*, 11 F.4th at 585-86. A plaintiff need not prove but-for causation, only that the protected activity is a motivating factor behind the defendant's conduct. *Id.* at 586. The "protected activity and the adverse action cannot be completely unrelated." *Id.* (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)). Circumstantial evidence may include evidence of "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other [persons] in the protected group." *Kidwell*, 679 F.3d at 966.

Here, Mariakis rushed Ortega with Ikar shortly after Ortega criticized Mariakis' conduct. (PFOF ¶¶ 142-45, 150.) Mariakis rushed Ortega with Ikar and directed that Ortega be handcuffed even though Ortega was maintaining a safe distance, complied with all commands, and did not verbally or physically make any threatening gestures towards Mariakis. (PFOF ¶¶ 136 – 49.) Mariakis also rushed Ortega with Ikar and directed that he be handcuffed even though Mariakis never had reasonable suspicion to believe that

Ortega had committed any crime.  (PFOF ¶¶ 14, 135, 144-45.)  A reasonable jury could

conclude that the timing coupled with these other facts creates a causal link between

Ortega's speech and the retaliation.

### 4. Mariakis is not entitled to qualified immunity on this claim.

The case law cited in subsections a through c above is sufficient to put Mariakis

on notice that Ortega's speech was protected, that threats accompanied by the use of Ikar

and handcuffing were sufficient to chill speech, and that he could not engage in

retaliatory conduct motivated by a person's speech.  The facts of those cases are

sufficiently similar to put Mariakis on notice of the constitutional violation.  Moreover,

because the record—viewed in Ortega's favor—establishes that Mariakis lacked probable

cause or reasonable suspicion to arrest or detain Ortega for any offense, this is not a case

in which qualified immunity can be salvaged by the existence of a lawful basis for

seizure.  Finally, as addressed in detail below, there was no other basis under a lawful

seizure analysis that would permit Mariakis' conduct toward Ortega.  Mariakis seized

Ortega without reasonable suspicion as soon as he directed Ortega away from the vehicle

and restricted his movements.  Accordingly, Mariakis' motion for summary judgment on

Ortega's First Amendment retaliation claim should be denied.

### B. Mariakis seized Ortega at various points throughout the encounter.

#### 1. Mariakis seized Ortega without reasonable suspicion as soon as he directed Ortega away from the vehicle.

"[A] person has been 'seized' within the meaning of the Fourth Amendment ...

only if, in view of all of the circumstances surrounding the incident, a reasonable person

would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573, (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). If a reasonable person would feel free "to disregard the police and go about his business," no seizure has occurred. *California v. Hodari D.*, 499 U.S. 621, 628, (1991). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

The Seventh Circuit recognized numerous factors for examination in determining whether a seizure has occurred:

> [C]ircumstances that suggest a seizure include "the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place." *United States v. Clements,* 522 F.3d 790, 794 (7th Cir.2008) (citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Courts also consider whether police made statements to the citizen intimating that he or she was a suspect of a crime, *United States v. Borys,* 766 F.2d 304, 311 (7th Cir.1985), whether the citizen's freedom of movement was intruded upon in some way, *Chesternut,* 486 U.S. at 575, 108 S.Ct. 1975, whether the encounter occurred in a public or private place, *United States v. Adebayo,* 985 F.2d 1333, 1338 (7th Cir.1993), and whether the officers informed the suspect that he or she was free to leave. *Id.* These factors, however, are neither exhaustive nor exclusive. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870 (indicating that such factors are merely"[e]xamples").

*United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015).

*Smith* is very helpful in the present case. In *Smith*, two officers on bicycles were investigating gunshots when they saw Smith walking in an alley alone at night. *Id.* at 682. The officers approached to within five feet of Smith and then parked their bicycles

at a 45 degree to Smith's line of travel. *Id.* They then asked him whether he had a gun and arrested him when he responded that he did. *Id.* The Seventh Circuit found the officers' actions to be a seizure and not a voluntary discussion. *Id.* at 685. The Court relied on several factors in reaching this decision, including the encounter was in a dark alley at night, involved "the threatening presence of multiple officers" (one with his hand on his gun), involved aggressive questioning (officers blocked his path), the aggressive nature of the question asked (officers did not introduce themselves or exchange pleasantries or identify that Smith was free to leave), and the officers physically obstructed Smith's freedom of movement with themselves and their bikes. *Id.* The *Smith* Court was not persuaded by the lack of physical contact by the officer, noting as follows:

> A seizure may transpire any time police conduct "communicate[s] to the reasonable person an attempt to capture or otherwise intrude upon [his] *686 freedom of movement." Such a communication can occur absent physical contact such as when police activate a siren or flashers, or, as in this case, when police act "aggressively to block [a person's] course or to control his direction or speed."

*Smith*, 794 F.3d at 685-86 (internal quotations omitted).

Passengers of a vehicle that is subject to a traffic stop can be questioned and removed from the vehicle. *US v. Muriel*, 418 F.3d 720 (7th Cir. 2005). But Ortega was not a passenger in a vehicle subject to a traffic stop. He was not pulled over and detained by an officer pulling over the car he was riding in. Instead, he was outside the vehicle standing in a parking lot. (PFOF ¶¶ 12-17.) Before any seizure such as a *Terry* stop can be performed on Ortega, there must be "reasonable belief or suspicion" directed at him.

*See Ybarra v. Illinois*, 444 U.S. 85, 94 (1979); *see also U.S. v. Lyons*, 733 F.3d 777, 782 (7th Cir. 2013). Here, Mariakis admitted at deposition that he had no reasonable suspicion of any criminal conduct to justify a *Terry* stop of Ortega; he only had the suspicion of Bryan driving after expiration of his license—which was solely directed at Bryan. (PFOF ¶¶ 8, 14, 15.) Accordingly, as soon as Mariakis directed Ortega to an unlit portion of the parking lot, told him it was a traffic stop, and demanded his identification in an authoritative voice (PFOF ¶¶ 16, 18, 20), Ortega (and any reasonable person) believed he was not free to go and was thus seized. *See Smith*, 794 F.3d 681, 684 (noting the tone of officer, whether freedom of movement is intruded upon, and whether officer said he is free to leave are all factors in considering a seizure). Since this seizure was admittedly not supported by reasonable suspicion as to Ortega, it violated the Fourth Amendment.

### 2. Mariakis arrested Ortega without probable cause when he kept him hand-cuffed for 18 minutes and detained for 28 minutes.

A *Terry* stop that becomes too long or unreasonably intrusive can turn into a arrest and thus must be based on probable cause. *U.S. v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994). There is no bright line rule on how long a *Terry* stop can last before it is unjustified. *Id.* In determining whether a stop is reasonable, "the court should consider the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation." U.S. v. Bullock, 32 F.3d 1004, 1015 (7th Cir. 2011) (quotation omitted). Here, given that the only crime initially suspected was driving with an expired license (which was not

directed at Ortega) and then Bryan's resisting/obstructing which was also not directed at Ortega, there was no need to handcuff Ortega at all, and certainly no reason to keep him handcuffed after the scene was secured and multiple officers were present. Certainly, Ortega should not have been handcuffed for around eighteen minutes. The detention in this case is a *de facto* arrest and must be supported by probable cause.

Defendant claims that the handcuffing of Ortega was necessary to control the scene. (Def Br. at 20-21). This is false. By the time Ortega was handcuffed, another officer was on the scene (and actually performed the handcuffing at Mariakis' direction) and Bryan was already handcuffed. (PFOF ¶¶ 127, 135). Accordingly, the scene was under control before Ortega was ever cuffed.

Defendant then claims that he had probable cause to arrest Ortega because he smelled marijuana coming from the car in which Ortega had been a passenger. (Def. Br. at 21). This is inconsistent with the evidence as it should be viewed on summary judgment. Despite Mariakis' proximity to Ortega and the white truck, here was no indication verbally or visually that Mariakis had any suspicion about marijuana prior to handcuffing Ortega. For example, Mariakis did not ask Ortega to search the vehicle. He did not question Ortega about marijuana use or possession. He did not ask Ortega if he had been in the vehicle recently. A reasonable jury could conclude that this was all pretext to justify his conduct towards both Ortega and Bryan, after an incident of this magnitude unfolded all because Mariakis believed someone was driving with an expired license.

Instead, when Mariakis first approached Ortega near the vehicle, he identified this was a traffic stop due to the driver's expired license. (Body cam at _) Mariakis remained intent on finding the vehicle's driver, which is consistent with the expired driver's license investigation. Further, around two minutes before cuffing Ortega, Mariakis again admitted that the only reason for the stop was Bryan's expired license. (PFOF ¶¶ 101, 102.) Additionally, in his deposition, Mariakis identified that he lacked reasonable suspicion with respect to Ortega. (PFOF ¶ 14.)

Mariakis then claims he also had probable cause to arrest Ortega for disorderly conduct and for obstructing an officer. (Def Br. at 22). Both of these statements are false. *In re Douglas D.*, 626 N.W.2d 725, 742 (Wis. 2001), the Wisconsin Supreme Court recognized that protected free speech cannot be prosecuted as disorderly conduct under Wis. Stat. § 947.01. Moreover, defendant wholly ignores how protected free speech cannot be grounds for an arrest for obstruction. As noted in *City of Houston*, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." 482 U.S. at 462-63.

### 3. Mariakis is not entitled to qualified immunity on Ortega's unreasonable seizure claim.

For the same reasons set forth above establishing a constitutional violation, Mariakis is not entitled to qualified immunity. The case law discussed in this section clearly established that a *Terry* stop may not be prolonged or rendered unreasonably intrusive through extended handcuffing absent probable cause, and that once the scene is

secured and an individual poses no threat, continued detention constitutes a *de facto* arrest requiring probable cause. The facts of those cases are sufficiently similar to put Mariakis on notice of the constitutional violation. Viewing the record in the light most favorable to Ortega, Mariakis lacked probable cause—or even reasonable suspicion—to arrest or otherwise seize Ortega for any offense, and no reasonable officer could have believed it was lawful to keep a compliant passenger handcuffed for approximately eighteen minutes and detained for nearly half an hour under these circumstances. Accordingly, qualified immunity does not shield Mariakis from liability on Ortega's unlawful arrest claim, and summary judgment should be denied.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully requests that Defendant's Motion for Summary Judgment be denied. Genuine issues of material fact exist and Defendant is not entitled to qualified immunity.

**STORMS DWORAK LLC**

Dated: January 23, 2026

*/s/ Jeffrey S. Storms*
Jeffrey S. Storms, MN Bar No. 387240
800 Hennepin Ave.
800 Pence Building
Minneapolis, MN 55403
Phone: 612.455.7055
Fax: 612.455.7051
jeff@stormsdworak.com

*Attorneys for Plaintiffs*